134 N.J. Super. 368 (1975)
341 A.2d 348
COLUMBIA BROADCASTING SYSTEM, INC., A NEW YORK CORPORATION, PLAINTIFF-APPELLANT AND CROSS-RESPONDENT,
v.
MELODY RECORDINGS, INC., A NEW JERSEY CORPORATION, DEFENDANT, AND NATIONAL CINEMATAPE, INC., A NEW YORK CORPORATION, ET AL., DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued February 18, 1975.
Decided May 13, 1975.
*371 Before Judges COLLESTER, LORA and HANDLER.
Mr. Clyde A. Szuch argued the cause for appellant and cross-respondent (Messrs. Pitney, Hardin & Kipp, attorneys).
Mr. Joel D. Siegal argued the cause for respondents and cross-appellants National Cinematape, Inc., American Cartridge Recording, A Division of National Communication Arts, Inc., Telecor Industries, Inc. and Audiotape, Inc. (Messrs. Hellring, Lindeman & Landau, attorneys).
Mr. Adrian M. Foley, Jr. argued the cause for respondent and cross-appellant United States Tape, Inc. (Messrs. McElroy, Connell, Foley & Geiser, attorneys).
Mr. Robert E. Levy argued the cause for respondent and cross-appellant Diamond Sounds, Inc.
The opinion of the court was delivered by HANDLER, J.A.D.
On January 10, 1973 Columbia Broadcasting System (hereinafter plaintiff or CBS) filed a complaint in the Superior Court, Chancery Division, on behalf of itself and other tape and record manufacturers seeking, among other things, an injunction against the corporate *372 and individual defendants for duplicating any recorded performance contained on a tape or record manufactured by plaintiff, an accounting for all proceeds received from the sale of "pirated" tapes and records, surrender of all unauthorized duplicated records and tapes, and compensatory and punitive damages. Summary judgment was granted in favor of defendants on May 28, 1973 and plaintiff's complaint was dismissed. This decision of Judge Kimmelman was reported at CBS v. Melody Recordings, Inc., 124 N.J. Super. 322 (Ch. Div. 1973).
Thereafter, on June 18, 1973, the United States Supreme Court decided Goldstein v. California, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). On the basis of this case CBS moved for a reconsideration of the decision and for summary judgment. On December 7, 1973 the lower court granted plaintiff's motion for summary judgment (in favor of CBS only and not as a class action) against the corporate defendants and denied the issuance of a permanent injunction.
These appear to be the essential facts: CBS is a manufacturer of records and contracts with well-known musical performers to obtain the exclusive right to manufacture and sell their records. Plaintiff obtains either the complete ownership or an exclusive license to manufacture and sell the record made by the performing artist and to use the name and likeness of the artist in the promotion, advertsiing and sale of the recordings. CBS pays for the copyright, hires union scale musicians and records an original production of the musical composition on record or tape.
Defendants are engaged in the business of duplicating magnetic tapes and sound records or records of musical compositions, described as "high quality reproductions," which are sold to distributors for resale to retailers. These reproductions are made from the original sound recordings manufactured by plaintiff. Defendants' activities are undertaken without the permission or authorization of plaintiff. Defendants' tapes and records, however, utilize their own *373 distinctive label and do not otherwise indicate that the product is that of CBS. It is agreed, therefore, that "palming off" in its traditional or conventional sense has not occurred as a result of defendants' actions.
Plaintiff's complaint against defendants pertains only to their duplications of CBS tapes and records made prior to February 15, 1972. It was stipulated that defendants have complied with the compulsory license provisions of the Federal Copyright Act, 17 U.S.C.A. § 1 et seq., which prior to February 15, 1972 provided that a person may reproduce mechanically musical copyrighted work upon the payment to the copyright proprietor of a royalty of two cents. Id. § 1(e). Defendants have filed requisite notices of intention and have paid CBS the compulsory license fee of two cents for each musical composition which has been recorded.
Recordings after February 15, 1972 are not involved by virtue of an amendment of the Federal Copyright Act in 1971 by Pub. Law 92-140, 85 Stat. 391, 17 U.S.C.A. § 1 et seq. as amended, effective February 15, 1972. This amendment gave to copyright owners the exclusive right to reproduce and distribute to the public reproductions of copyrighted sound recordings. 17 U.S.C.A. § 1(f). The effect of this amendment, which was to remain operative until January 1, 1975, is to prevent defendants from rerecording tapes and records "fixed, published, and copyrighted" between February 15, 1972 and January 1, 1975.[1] Defendants have not, and are not alleged to have, rerecorded tapes and records "fixed, published and copyrighted" after February 15, 1972.
The court below initially granted defendants' motion for summary judgment based on Sears, Roebuck & Co. v. Stiffel Company, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964), and Compco Corp. v. Day-Brite Lighting, Inc., 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964). These *374 cases were thought to embrace the proposition that state law may not prevent the copying of unpatentable or uncopyrighted articles since such a prohibition would conflict with federal patent and copyright laws. As a result of the Supreme Court's later decision of Goldstein v. California, supra, the court below reversed itself and granted summary judgment for plaintiff. It did so on the ground that Goldstein indicated that state action in the copyright field is not precluded by the Sears and Compco cases and it ruled that such state action is not limited to legislative enactment but encompasses the application of state common law doctrines of unfair competition.
Defendants, though taking individual approaches, argue basically that Goldstein, read in the context of its particular facts, contemplates that only state action in the form of statutory enactments would be permissible to regulate the duplication or copying of pre-February 15, 1972 sound recordings and that other forms of state control in this area remain barred by virtue of a paramount federal concern.
We disagree. While Goldstein did involve the criminal enforcement of a provision of the California Penal Code, and the Supreme Court ruled specifically that the California statute was not federally preempted, the court did not hold, or otherwise suggest, that state action in this area, in a form other than legislative enactment, would be barred. Goldstein may be viewed as permitting local protection of musical performances under the judicial aegis of the common law, as well as by statute. Mercury Record Pro., Inc. v. Economic Consult., Inc., 64 Wis.2d 163, 218 N.W.2d 705, 712 (Sup. Ct. 1974); Jondora Music Pub. Co. v. Melody Recordings, Inc., 362 F. Supp. 488, 497 (D.N.J. 1973), rev'd on other grounds, 506 F.2d 392 (3 Cir.1974); Note, "Copyrights: States Allowed to Protect Works Not Copyrightable Under Federal Law," 58 Minn. L. Rev. 316, 324 (1973); Note, "Goldstein v. California: A New Outlook For the Misappropriation *375 Doctrine," 8 Univ. of San Francisco L. Rev. 199 (1973).
The meritorious issue is whether the state law of New Jersey prohibits the practices of defendants in their duplication and distribution of the musical tapes and records produced from CBS sound recordings prior to February 15, 1972. With respect to this question it is claimed initially by defendants that the New Jersey Unfair Competition Law, N.J.S.A. 56:4-1 et seq., governs this issue and that this statute, by implication, permits the duplication of pre-February 15, 1972 sound recordings since that statute does not, by its express terms, proscribe activities of the nature undertaken by defendants.
N.J.S.A. 56:4-1 et seq. applies specifically to situations involving the wrongful appropriation or misuse of trademarks, names, brands, good-will and the like, as well as false, misleading or deceptive advertisement of products and certain pricing practices. It does not purport to deal with the type of conduct engaged in by defendants. Nor, does it attempt to regulate different unfair business practices which historically have been reached by common law precepts. Cf. American Shops, Inc. v. American Fashion, etc., Inc., 13 N.J. Super. 416 (App. Div.), certif. den. 7 N.J. 576 (1951). Consequently, we hold that the statute relied upon does not, by negative implication, immunize from judicial concern business or commercial conduct, which is injurious and otherwise unfair, improper and wrongful.
The doctrine of unfair competition traditionally has been interpreted by courts in accordance with common law principles. Understandably, because the common law of unfair competition has evolved unevenly over the years, judicial applications in this tort field have not always been uniform or fixed. Squeezit Corp. v. Plastic Dispensers, 31 N.J. Super. 217, 221 (App. Div. 1954); Ellis, Trade Secrets § 9 (1953). The tendency of the law, however, has been to espouse more scrupulous standards of business fairness and commercial morality in trade. Q-Tips v. Johnson & Johnson, *376 206 F.2d 144, 145 (3 Cir.), cert. den. 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953). Reflecting this bent, it has been observed that the essence of unfair competition is fair play. American Shops, Inc. v. American Fashion, etc., Inc., supra, 13 N.J. Super. at 420. In Sachs, etc., Radio Co. v. Sachs Quality Stores Corp., 39 N.J. Super. 70 (App. Div. 1956), Justice (then Judge) Francis said:
* * * In an era when the struggle in the market place for the favor of the public has become increasingly intense, equity has grown more vigilant in the search for efforts on the part of one competitor to capitalize on the good will of another, to pass off his goods as those of another, or to pirate the trade of his competitor by unfair or deceptive practices. And the pressure of its restraining hand is measured by the degree of the inequitable conduct. [at 85]
Defendants contend that the common law of New Jersey would not prevent the duplication of sound recordings, as here, as long as the duplicator does not pass off its product as that of another, a situation commonly called "palming off." They cite for support Press Publishing Co. v. Atlantic County Advertiser, Inc., 59 N.J. 356 (1971); Squeezit Corp. v. Plastic Dispensers, supra, and French American, etc., Co. v. Park Plastics Co., 20 N.J. Super. 325 (App. Div. 1952).
In Press Publishing Co., relying upon Sears and Compco, the court held that a local shopping guide could copy the advertisements prepared and published by a daily newspaper, regardless of whether the advertisements were copyrightable and had not been copyrighted in the case, or whether they were not copyrightable by anyone. The court reasoned that to forbid copying would conflict with federal policy which, as quoted from Compco, allows "`free access to copy whatever the federal patent and copyrighted laws leave in the public domain.'" 59 N.J. at 359.
In recent years it has been recognized that the scope and interpretation of Sears and Compco have been greatly limited and courts have tried to restrict the reach of these *377 decisions wherever possible to the area of patented and copyrighted articles rather than to extend them to other areas of unfair competition, including misappropriations or exploitation of a business organization such as news, record and broadcasting piracy. 2 Callman, Unfair Competition, Trademarks and Monopolies (3 ed. 1967) § 60.4(c) at 522-523; Pottstown Daily News Pub. Co. v. Pottstown Broadcasting Co., 247 F. Supp. 578 (E.D. Pa. 1965); Capitol Records, Inc. v. Greatest Records, Inc., 43 Misc.2d 878, 252 N.Y.S.2d 553 (Sup. Ct. 1964). More significant for present purposes, the United States Supreme Court, subsequent to Press Publishing Co., held in Goldstein, supra, that state regulation of the duplication of recordings of musical performances would not conflict with federal law. Cf. 2 Callman, supra, § 61.1 at 80, n. 13.2 (3 ed. cum. Supp. 1974).
In both Squeezit Corp. v. Plastic Dispensers, Inc., supra, and French American, etc. Co. v. Park Plastics Co., supra, it was held that defendants had not engaged in unfair competition by their marketing of merchandise which were imitations of the products of the respective plaintiffs. The court stated in Squeezit Corp.:
In the absence of a patent, there is nothing to prevent the imitation or reproduction of a product provided the imitator does not misrepresent to the public that his product is made by others or cause confusion as to whose product it is or that the product has not yet acquired a secondary meaning or an identification coming from appearance. [31 N.J. Super. at 222]
These decisions do not imply, as argued by defendants, that actionable unfair competition is restricted solely to situations involving "palming off" or a product which has acquired a secondary meaning. Misappropriation and tortious exploitation of another's product may constitute unfair competition without a "palming off." International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1915); Metropolitan Opera Ass'n. v. Wagner-Nichols Recorder Corp., 199 Misc. 786, 101 N.Y.S.2d *378 483 (Sup. Ct. 1950), aff'd 279 App. Div. 632, 107 N.Y.S.2d 795 (1951); Veatch v. Wagner, 116 F. Supp. 904, 14 Alaska 470 (1953); cf. Norwich Pharmacal Company v. Sterling Drug, Inc., 271 F.2d 569, 571 (2 Cir.1959), cert. den. 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960); Harvey Machine Co. v. Harvey Aluminum Corp., 9 Misc.2d 1078, 175 N.Y.S.2d 288, 291 (Sup. Ct. 1957).
In the setting of contemporary business practices, there is a critical, albeit fine, line separating commercial parroting from pirating. A dichotomy exists between the copying, simulation or limitation of the design of a product, or even an idea inherent in a product, on the one hand, and, on the other, the actual use of the product itself. "`[T]here is a distinction between such an act, i.e., the copying of an idea, and * * * the use of the identical product for the profit of another.'" Capitol Records, Inc. v. Greatest Records, Inc., supra, 252 N.Y.S.2d at 556-557; see also, Note, "Copying Misappropriation," 71 Colum. L. Rev. 1444, 1458-1463 (1971).
Permissible imitation entails the imitator bringing to bear its own efforts and resources in producing its own product, although it endeavors to simulate or ape the product of another. E.g., Squeezit Corp. v. Plastic Dispensers, supra (defendant manufactured its own red or yellow plastic dispenser shaped like a tomato which resembled plaintiff's dispenser); French American, etc. Co. v. Park Plastics Co., supra (defendant manufactured a plastic ukulele similar to that of plaintiff). Thus, tolerable copying of a product in this sense might be presented here, for example, if defendants had analyzed the recorded performances of CBS and then hired the same or comparable artists and musicians to perform the identical musical composition, in a like manner, and under the same conditions as achieved by CBS and recorded by it on a particular record or tape. As stated, however, in Liberty/UA, Inc. v. Eastern Tape Corp., *379 11 N.C. App. 20, 180 S.E.2d 414, app. dismissed 278 N.C. 702, 181 S.E.2d 600 (App. Ct. 1971):
Defendants here are not copying a design or concept. They have not obtained the same artist to record the same song in an identical manner. * * * Conduct of that sort, however, is a far cry from appropriating, for use in competition with plaintiff, the very product which plaintiff produced with its own resources. [at 417]
What is involved in this case is the direct taking by defendants of the artistic and highly creative work of plaintiff  the recorded performance of a specially arranged musical composition. Defendants have thus appropriated the unique product of CBS by rerecording its original records. The commercial injury ensues because defendants have accomplished this at a minimal cost and then sold their "original" duplicates for a substantial profit. The actionable unfairness of this practice inheres in a combination of factors  the substantial investment of time, labor, money and creative resources in the product by plaintiff, the utilization of the actual product by defendant, the misappropriation or use of the appropriated product by defendant in competition with plaintiff, and commercial damage to plaintiff. Note, 8 Univ. of San Francisco L. Rev., supra at 201.
Further support for plaintiff's position is drawn from International News Service v. Associated Press, supra. The United States Supreme Court there held that a cooperative association of newspapers which gathers and distributes news may enjoin a competing news agency from appropriating news taken from bulletins issued by the association and from selling it to competitors of the association. The court stated:
* * * [D]efendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money and which is salable by complainant for money, and that defendant in appropriating it and selling it as its own is endeavoring to reap where it has *380 not sown, and by disposing of it to newspapers that are competitors of complainant's members is appropriating to itself the harvest of those who have sown. Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not, with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gathering the news. The transaction speaks for itself and a court of equity ought not to hesitate long in characterizing it as unfair competition in business. [248 U.S. at 239-240, 39 S.Ct. at 72-73]
The court below, on the strength of International News Service, concluded that the Supreme Court's perception of of the scope of unfair competition, as reflected in that decision, was fully applicable to the circumstances of the present case. We are in agreement with this conclusion.
In Liberty/UA, Inc. v. Eastern Tape Corporation, supra, the court stated:
The damage occurring to plaintiff's business from the conduct of defendants is easily apparent. Plaintiff expends substantial sums of money in obtaining the services of popular artists and in recording their performances. As found by the trial court, `[i]n order to sell the recordings embodying performances to which plaintiff possesses exclusive rights, and to build good will, such performances, the names of the artists, and the recordings produced by plaintiff are advertised and promoted at great expense to plaintiff.' In appropriating the fruits of plaintiff's initiative, skill, effort and expense to their own use, defendants obviously circumvent a great portion of the cost of engaging in the recording business. They thereby gain substantial competitive advantage over plaintiff. This conduct, it seems to us, amounts to unfair competition and is subject to restraint. [180 S.E.2d at 415-416]
Capitol Records, Inc. v. Spies, 130 Ill. App.2d 429, 264 N.E.2d 874 (Ct. App. 1970), also considered, in a similar situation, that defendants by copying plaintiff's musical tapes and records wrongfully appropriated the product itself  the actual sounds recorded in the plaintiff's albums. Other courts, as well, have recognized that unfair competition occurs where, as here, defendants have not endeavored, *381 through their own input, to create a comparable sound recording or even a good facsimile of an original recorded musical composition, but rather have used or taken in toto the original recorded musical performance of another by rerecording it, and then realized a substantial profit on the sale of the duplicate. Mercury Record Pro., Inc. v. Economic Consult. Inc., supra, 218 N.W.2d 705; Capitol Records, Inc. v. Erickson, 2 Cal. App. 3d 526, 82 Cal. Rptr. 798 (D. Ct. App. 1969), cert. den. 398 U.S. 960, 90 S.Ct. 2176, 26 L.Ed.2d 545 (1970); Capitol Records, Inc. v. Greatest Records, Inc., supra; National Broadcasting Co., Inc. v. Nance, 506 S.W.2d 483 (Mo. Ct. App. 1974); Columbia Broadcast. Sys., Inc. v. Custom Recording Co., 258 S.C. 465, 189 S.E.2d 305 (Sup. Ct. 1972), cert. den. 409 U.S. 1007, 93 S.Ct. 437, 34 L.Ed.2d 300 (1972); cf. Columbia Broadcast. Sys., Inc. v. Documentaries Unlim., 42 Misc.2d 723, 248 N.Y.S.2d 809 (Sup. Ct. 1964).
The fact that defendants have complied with the compulsory licensing provision of the Federal Copyright Act, 17 U.S.C.A. § 1(e), is no defense to their unlawful activity. The federal statute authorizes one to make a "similar use" of the copyrighted musical composition upon the payment of a royalty fee. This does not authorize such a person, however, to use the copyrighted work by duplicating it or making an identical copy of the recorded copyrighted composition made by a recording company which itself has paid the royalty fee in order to perform and record the musical work. Cf. Jondora Music Pub. Co. v. Melody Recordings, supra, 506 F.2d 392; Edward B. Marks Music Corp. v. Colorado Mag., Inc., 497 F.2d 285 (10 Cir.1974), cert. den. 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975); Duchess Music Corp. v. Stern, 458 F.2d 1305 (9 Cir.), cert. den. 409 U.S. 847, 93 S.Ct. 52, 34 L.Ed.2d 88 (1972).
*382 Defendants' final contention is that the court should await direction from the Legislature before undertaking to create new rights in the area of unfair competition. The protection of business against unlawful injury, however, is a matter to which the courts must be responsive; it is not a concern solely of the Legislature. E.g., J.B. Liebman & Co., Inc. v. Leibman, 135 N.J. Eq. 288 (Ch. 1944); Sachs, etc., Radio Co. v. Sachs Quality Stores Corp., supra. We are, of course, mindful that the areas embracing unfair competition are appropriate for legislative treatment. We note also the pendency in the Legislature of proposals which would provide criminal sanctions for the practices which are the subject of this litigation. Assembly Bill 1916 (July 8, 1974); Assembly Bill 3256 (April 10, 1975). Prospective legislative action, however, while instructive, cannot impart substance to the current law. Donaldson v. No. Wildwood Bd. of Ed., 65 N.J. 236, 240 (1974); cf. East Orange v. Livingston Tp., et al., 102 N.J. Super. 512, 535 n. 2 (Law Div. 1968), aff'd o.b. 54 N.J. 96 (1969).
The common law doctrine of unfair competition is well-grounded and has long and frequently been interpreted and applied by the courts. This is entirely consonant with the obligation of the judiciary to expound and develop the common law to serve justice and the interests of society. La Stella v. Garcia Estates, 66 N.J. 297, 305 (1975). Accordingly, we hold that the court below properly entertained the action and on the merits for the reasons already advanced, entered summary judgment in favor of plaintiff.
With respect to CBS' request for an injunction and other relief, we are of the view that the trial judge should have addressed and resolved that aspect of the controversy. Injunctive relief undoubtedly was called for but the judge, in the exercise of its discretion, could have provided for a stay thereof pending an appeal. The nature and extent of the relief appropriate under all of the circumstances should, *383 however, be determined by the trial judge. Accordingly, the matter is remanded for a consideration of the injunctive and other relief which should be granted.
Affirmed but remanded with respect to relief to be granted. We do not retain jurisdiction.
NOTES
[1] The act has recently been amended to remove the expiration date of January 1, 1975. Pub. Law 93-573, 88 Stat. 1873.